CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 06 2019

JULIA C. DUDLEY, CLERK
BY: /s/ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JENNIFER OWEN, | ) |
| Plaintiff, | ) Civil Action No. 7:17CV00205 |
| | ) **MEMORANDUM OPINION** |
| v. | ) |
| | ) By: Hon. Glen E. Conrad |
| COUNTY OF FRANKLIN, VIRGINIA, et al., | ) Senior United States District Judge |
| Defendants. | ) |

Jennifer Owen filed this action against the County of Franklin, Virginia (the "County") and Robert Andrew Morris. Owen asserts claims of hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") against the County, and related claims of assault and battery against Morris. The County has moved for summary judgment on the retaliation claim. The court held a hearing on the motion via teleconference on February 7, 2019. The motion has been fully briefed and is ripe for review. For the following reasons, the motion will be denied.

## Background

The following facts are either undisputed or presented in the light most favorable to Owen. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (emphasizing that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor," when ruling on a motion for summary judgment).

In December of 2013, the County hired Owen to work as a building inspector. Owen Dep. 11, Dkt. No. 109-1. Morris became the County Building Official and Owen's head supervisor in November of 2014. Morris Dep. 27, 47-48, Dkt. No. 109-15. Morris remained in that position for the duration of Owen's employment.

Within months of becoming Owen's supervisor, Morris began to sexually harass her. Id. 101. The harassment began with comments regarding the plaintiff's attractiveness, which Morris made in person and in text messages. Id. 47–48. When the comments were made at work, Owen would point to a photograph of Morris' wife and ask him to "stop." Id. 48. Rather than doing so, Morris engaged in increasingly inappropriate conversations with Owen. For instance, Morris asked Owen how she had lost her virginity. Id. 106. When Owen refused to answer his question, Morris proceeded to describe his first sexual experience in detail. Id. 106. Morris also made sexual advances via text message, asked Owen to send him inappropriate photographs of herself, offered to perform oral sex on Owen, and told Owen they were going to "do it" and "she was going to like it." Id. 123, 125, 127–28, 154–55. Owen reminded Morris that he was married with four children and asked him to "stop." Id. 126. Rather than doing so, Morris requested that Owen perform oral sex on him for his birthday. Id. 127.

In the summer of 2015, Morris began to engage in inappropriate physical contact. Id. 35. Morris touched Owen's breasts on several occasions. Id. 146; see also id. ("[H]e would come up behind me and grope me and grab me."). He also "forced [Owen] to kiss him many times," "tried to force her to feel his penis," and "placed his hand on [her] genital area" while she was driving. Id. 146–47, 150–52.

Lewis Turner, another County employee in Owen's chain of command, also made comments of a sexual nature to the plaintiff. Turner showed Owen photographs of women and ask her if she thought the women's breasts were real or fake. Id. 39. Turner also engaged in "drunk texting," during which he sent Owen inappropriate messages. Id. 42.

Owen complained to Morris about Turner's behavior, but "nothing changed." Id. 40. Instead, as the year progressed, Owen's work environment worsened, and she began to fear that Morris would hurt her or terminate her employment. Id. 71. Morris advised Owen that she

2

would be immediately fired if he ever saw her enter the area of the building where the County's human resources ("HR") department was located. Id. 71–72.

In November of 2015, Owen made it clear that she was not going to tolerate Morris' behavior any longer. While Owen was sitting at her desk, Morris approached her from behind, placed his hands down her shirt and under her bra, and squeezed her breasts. Id. 147. In response, Owen slapped her fist on the desk and said, "That's it . . . . You're going to stop touching me now. No more. Leave me alone. Stop." Id.

Owen contends that Morris' demeanor subsequently changed. He became "cold" and "mean," and imposed restrictions on the plaintiff. Id. 155. For instance, Morris told Owen that she was no longer allowed to bring food from home or exercise during her lunch break, and that she would be required to go out to eat with "the guys." Id. 157. Morris also made Owen return her work vehicle. Id. 158.

On February 5, 2016, Morris and Turner met with Owen in a conference room. Id. 61. During the meeting, Morris presented the plaintiff with a bulleted list of alleged reasons to terminate her employment. Id. He advised Owen that should could either quit her job or be fired. Id.

After meeting with Owen, Morris asked Patricia Barnes, an HR official, to prepare a "Notice of Intent to Terminate" letter. Barnes Dep. 42, Dkt. No. 109-2. The letter advised Owen that she would have three days to respond to the proposed course of action before Morris made a final decision. Notice of Intent to Terminate, Dkt. No. 109-7.

Owen met with Barnes after work that same day in Barnes' office. Owen Dep. 65. During the meeting, Owen told Barnes that Morris had made sexual advances toward her and that she had rejected his advances. Id. 65–66. Owen also indicated that the asserted reasons for

her proposed termination were "fabrications" and that Morris was retaliating against her for "standing up for [her]self after months of him molesting [her] and telling him to stop." Id. 63.

At the conclusion of the meeting, Barnes told Owen that she would investigate the alleged misconduct. Id. 76. However, Barnes noted that Morris was a "golden child" and that she did not believe the County "would ever do anything about him." Id. 76. Barnes also warned that Owen would "never work for another municipality again" if she decided to pursue a complaint against Morris. Id.

Morris had knowledge of Owen's meeting with Barnes. See Morris Dep. 107 ("I know HR had a meeting with Ms. Owen . . . . It was after hours."). After the meeting, Barnes spoke to several employees regarding Owen's allegations. There is a dispute in the record as to whether Barnes questioned Morris. See Barnes Dep. 29 ("I spoke to . . . Barbara Mills, Lewis Turner, [and] Kenny Altice."); but see Position Statement 4, Dkt. 109-19 ("Ms. Barnes conducted a preliminary investigation to determine if there was any evidence to substantiate Ms. Owen's statement. Ms. Barnes interviewed Mr. Morris, Mr. Turner, and other members of the Developmental Services Department.").

On February 10, 2016, Morris terminated Owen's employment. In a Notice of Termination issued that same day, Morris advised Owen that the employment decision was based on the following violations of HR Administrative Policy No. 2.50: abuse of County time for personal business; insubordination or failure to follow a supervisor's instructions; leaving the work site during work hours without permission; and unauthorized use or misuse of County property. Notice of Termination, Dkt. No. 109-8.

## Procedural History

Owen filed the instant action on May 8, 2017, after exhausting her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Owen filed an

4

amended complaint on July 14, 2017. In Count I of the amended complaint, Owen claims that she was subjected to a sexually hostile work environment in violation of Title VII. In Count II, Owen claims that her employment was terminated in retaliation for "complaining about the harassment and hostile work environment." Am. Compl. ¶ 40, Dkt. No. 16. In Count III, Owen asserts claims of assault and battery against Morris.

On November 30, 2018, the County moved for summary judgment on the retaliation claim. The court held a hearing on the motion on February 7, 2019. The motion has been fully briefed and is ripe for review.

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to grant a motion for summary judgment, the court must "view[] the facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Woollard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013). To withstand a summary judgment motion, the non-movant must produce sufficient evidence from which a reasonable jury could return a verdict in her favor. Anderson, 477 U.S. at 248.

## Discussion

Title VII makes it unlawful for an employer to retaliate against an employee "because [the employee] has opposed any practice made an unlawful practice by this subchapter," or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). The first part of this statute is known as the "opposition clause," while the second is referred to as the "participation clause." Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 900 (4th Cir. 2017)

5

(internal quotation marks omitted). Owen's retaliation claim is premised on the opposition clause.

To establish a prima facie case of retaliation in violation of Title VII, a plaintiff must prove: (1) that she engaged in protected activity; (2) that her employer took a materially adverse action against her; and (3) that a causal connection existed between the protected activity and the materially adverse action. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005). In moving for summary judgment, the County focuses exclusively on the first element, arguing that "Owen did not engage in protected activity as a matter of law." Br. in Supp. of Mot. Summ. J. 4, Dkt. No. 103. For the following reasons, however, the court disagrees.

The opposition clause of the antiretaliation provision, by its terms, prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). Because the term "oppose" is not defined in the statute, the Supreme Court has held that the term "carries its ordinary meaning: '[t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand.'" Crawford v. Metro. Gov't of Nashville & Davidson Cty., 555 U.S. 271, 276 (2009) (internal citations omitted) (quoting Webster's New International Dictionary 1710 (2d ed. 1957)). "This broad definition led the Court to conclude that the threshold for oppositional conduct is not onerous." DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015). In the case before it, the plaintiff "described sexual instances of sexually harassing behavior" by the school district's employee relations director, after being asked by a human resources officer if she had witnessed the director engage in inappropriate behavior. Crawford, 555 U.S. at 274. Although the plaintiff had not complained about the director's conduct or initiated the inquiry, the Supreme Court held that the plaintiff's response was "covered by the opposition clause." Id. at 276. In reaching its decision, the Court emphasized that "Crawford's description of the louche goings-on would certainly qualify in the

6

minds of reasonable jurors as 'resist[ant]' or 'antagoni[stic]' to" the director's treatment. Id. The Court reasoned that "a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question." Id. at 277–78.

The United States Court of Appeals for the Fourth Circuit "also has articulated an expansive view of what constitutes oppositional conduct." DeMasters, 796 F.3d at 417. The Fourth Circuit has recognized that such conduct "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). "And while the oppositional activity must be directed to 'an unlawful employment practice' under Title VII, 42 U.S.C. § 2000e-3(a)," the Fourth Circuit has "made clear that [courts] should also interpret 'unlawful employment practice' broadly." DeMasters, 796 F.3d at 417 (citing Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (en banc)). "Thus, 'an employee is protected when she opposes 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful,' and the Title VII violation to which the oppositional communication is directed 'may be complete, or it may be in progress.'" Id. (quoting Boyer-Liberto, 786 F.3d at 282).

In this case, the unlawful employment practice at issue is sexual harassment in the workplace. See Bator v. Hawaii, 39 F.3d 1021, 1028 (9th Cir. 1994) ("Courts have recognized that sexual harassment is sex discrimination in violation of Title VII at least since 1977."). The County seemingly acknowledges that Owen's testimony regarding Morris' conduct would

7

support an actionable hostile work environment claim.* However, the County argues that Owen did not engage in protected opposition activity by merely rejecting Morris' advances and asking him to stop his harassment.

The Fourth Circuit has not addressed the question of "whether a person who rejects a supervisor's sexual advances has engaged in protected activity." Tate v. Exec. Mgmt. Servs., Inc., 546 F.3d 528, 532 (7th Cir. 2008) (assuming, for purposes of argument, "that there may be circumstances in which a person who rejects his supervisor's sexual advances has engaged in a protected activity"). There is a split of authority among the few circuits that have decided the issue. The Eighth Circuit has held that a plaintiff "engage[s] in the most basic form of protected activity when she [tells] her supervisor . . . to stop his offensive conduct." Ogden v. Wax Works, Inc., 214 F.3d 999, 1007 (8th Cir. 2000) (internal quotation marks omitted). Similarly, the Sixth Circuit has concluded that "a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII." EEOC v. New Breed Logistics, 783 F.3d 1057, 1067 (6th Cir. 2015). It appears that the Fifth Circuit is the "only [circuit that] has concluded that communication directly solely to a harassing supervisor does not constitute protected activity." Id. at 1068. In LeMaire v. Louisiana, 480 F.3d 383 (5th Cir. 2007), the Fifth Circuit observed that "the only arguable protected activity" was the plaintiff's "actual rejection of [the harassing supervisor's] advances" and that the plaintiff had provided "no authority for the proposition that rejecting sexual advances constitutes a protected activity for purposes of a retaliation claim under Title VII." 480 F.3d at 389. Consequently, the Fifth Circuit affirmed the grant of summary judgment to the employer on the retaliation claim. Id. (citing Frank v. Harris Cty., 118 F. App'x 799, 804 (5th Cir. 2004) (unpublished) (upholding judgment for the employer

---

* The County did not move for summary judgment on Count I.

8

where the plaintiff provided "no authority for the proposition that a single 'express rejection' to [a supervisor] constitutes as a matter of law a protected activity for purposes of retaliation")).

The County urges the court to side with the Fifth Circuit and other district courts that have held that employees do not engage in protected activity by merely declining a harassing supervisor's advances or asking a supervisor to stop his offending conduct. Def.'s Br. Supp. Mot. Summ. J. 5, Dkt. No. 103 (citing Yancey v. Nat'l Ctr. on Insts. & Alternatives, 986 F. Supp. 945 (D. Md. 1997), aff'd without discussion, 141 F.3d 1162 (4th Cir. 1998) (unpublished table decision); Rachel-Smith v. FTData, Inc., 247 F. Supp. 2d 734, 748 (D. Md. 2003)). However, in reaching its decisions in LeMaire and Frank, "the Fifth Circuit neither assessed the language of the opposition clause of Title VII nor indicated why a complaint to the harassing supervisor would not fall within the confines of the provision." New Breed Logistics, 783 F.3d at 1068. Moreover, both of these cases, and others cited in the County's initial brief, were decided before the Supreme Court adopted an "expansive interpretation of the opposition clause" in Crawford. Townsend v. Benjamin Enters., 679 F.3d 41, 48 n.7 (2d Cir. 2012); see also DeMasters, 796 F.3d at 416 (discussing the "broad definition" applied by the Supreme Court).

After reviewing existing caselaw, the court agrees with the Sixth and Eighth Circuits that an employee engages in protected activity when the employee asks a supervisor to stop his sexually harassing behavior. This conclusion comports with the plain language of the opposition clause, the broad interpretation articulated in Crawford, and the Fourth Circuit's similarly "expansive view of what constitutes oppositional conduct." DeMasters, 796 F.3d at 417. As the Sixth Circuit explained in New Breed Logistics:

> Sexual harassment is without question an 'unlawful employment practice.' If an employee demands that his/her supervisor stop engaging in this unlawful practice—i.e., resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct. Importantly, the language of the opposition clause does not specify to whom

9

> protected activity must be directed. Therefore, it would be unfair
> to read into the provision a requirement that a complainant only
> engages in protected activity when s/he opposes the harassment to
> a particular official designated by the employer.

783 F.3d at 1067–68; see also Charest v. Sunny-Aakash, LLC, No. 8:16-cv-2048, 2017 U.S. Dist. LEXIS 152550, at *18 (M.D. Fla. Sept. 20, 2017) (finding the reasoning in New Breed Logistics to be "sound" and observing that it "would undermine the fundamental purpose of the statute, if Title VII's protections from retaliation were not triggered when an employee confronts a supervisor and demands that the harassment stop").

Viewing the evidence in the light most favorable to Owen, the court concludes that a reasonable jury could easily find that Owen's statements to Morris regarding his offensive behavior constituted protected activity. This is not a case in which an employee merely rejected a supervisor's advances on one occasion. Instead, the plaintiff's evidence indicates that Morris subjected Owen to increasingly inappropriate sexual comments and physical contact, and that she repeatedly told Morris to cease the harassment. On the final occasion in November of 2015, Morris approached Owen from behind, placed his hands under her shirt and bra, and squeezed her breasts. In response, Owen slapped her fist on her desk and demanded that Morris stop touching her and leave her alone. Such evidence, if proven, would be sufficient to establish that Owen engaged in protected activity.

Additionally, the plaintiff has offered evidence indicating that her oppositional activity was not limited to communications with Morris regarding his offending conduct. Owen also complained to Morris about Turner's behavior, and she reported Morris' harassment to Barnes before a final termination decision was made. See DeMasters, 796 F.3d at 413, 417–18 (holding that "the proper test for analyzing oppositional conduct requires consideration of the employee's course of conduct as a whole," rather than a "myopic" evaluation of "discrete acts"). While the County argues in its reply brief that Barnes did not relay Owen's allegations to Morris, the court

10

agrees with the plaintiff that a genuine dispute of material fact exists with respect to this issue. See Position Statement 4 (indicating that Barnes spoke to Morris about Owen's allegations of sexual harassment); see also Am. Ctr. for Int'l Labor Solidarity v. Fed. Ins. Co., 518 F. Supp. 2d 163, 168 (D.D.C. 2007) (noting that EEOC "materials such as Position Statements may be admissible as evidence of party admissions or for purposes of witness impeachment") (collecting cases).

In sum, the court concludes that the protection afforded by the opposition clause extends to employees who demand that supervisors stop engaging in sexually harassing behavior, and that a reasonable jury could find that the plaintiff engaged in protected oppositional activity in the instant case. Accordingly, the County is not entitled to summary judgment on the retaliation claim.

### Conclusion

For the reasons stated, the County's motion for summary judgment will be denied. The case will proceed to trial on all three counts of the amended complaint.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This ___ day of March, 2019.

_____
Senior United States District Judge